Case No. 18-1218. Lori Birkhead v. Elephant Petitioners v. Federal Energy Regulatory Commission. Ms. Elephant is the petitioner, Ms. Solomon is the respondent, and Ms. Jones-Young is the interviewee. Good morning, Your Honors. If you're ready, may it please the Court. I'm Carolyn Elephant for the Citizens Petitioners in this case. Your Honors, affirming the Commission's decision in this case would have two unfortunate, two troubling results. The first is that it would condone the use of site effect to select a site and to reject an otherwise environmentally and operationally superior site. And second, in my view, affirming this case would require this Court to vacate its decision in the Sierra Club Sable Trail case. I'll first discuss some of the issues relating to site control. In this case, FERC relied on the applicant's ownership of a site, of one particular site, to reject the approval of an environmentally superior site. The alternative site, most importantly, would have reduced the emissions of this project, this is a 60,000 horsepower compressor station, and would have reduced the emissions by 40 percent. And that's a fact in the record that isn't disputed. So is it your position that FERC can't consider at all that, you know, it might be preferable not to have to rely on eminent domain to do the project? So we've raised two arguments with respect to site control. One of them is just a process argument related to NEPA. The NEPA regulations provide that an applicant cannot take any action in advance of an agency decision that would foreclose serious consideration of an alternative. And we believe that, first, the site control foreclosed FERC's serious consideration of an alternative. But as to your more direct question, Your Honor, we also did raise the issue of site control from a substantive perspective. And what we argued is that, in this case, we don't believe that site control is a valid consideration because an applicant has the ability to exercise eminent domain. But even accepting that FERC does have a policy of avoiding eminent domain, then there's no indication it does. It's a policy, it has a practice of reducing impacts on landowners, and one component of that would be minimizing eminent domain. And in this case, the Commission found that the impacts to landowners were very minimal. The other issue in this case that is different from other cases where eminent domain is exercised is, again, just the impacts that are minimal. So we would concede that there may potentially be cases where eminent domain might be considered as a valid policy factor. For example, if you can avoid eminent domain of thousands and thousands of properties by focusing on site control in another situation. But to the extent that avoiding eminent domain is a valid policy, it's not something that's present here. And that's also a distinction in this case with the Midcoast case. Because Midcoast, of course, is this Court's case that stands for the proposition that if there's a compelling FERC policy, FERC can choose an environmentally inferior site. So in the Midcoast case, first of all, the policy was competition. But the other factor that the Court noted is that that policy was not merely theoretical. By approving the inferior site in that case, the Commission allowed for cities which had not previously had access to a competitive gas supply for 40 years, it allowed them to attract a different supplier. Again, in this case, there's no indication that FERC had already found that the impacts of eminent domain were minimal. And so to elevate the importance of it, to select a site that would have reduced impacts by 40% was an irrational policy decision in this case. When you say elevate the importance, is this all related? Is that entire argument based on this sentence of JA 344? Additionally, Tennessee has identified a landowner willing to negotiate the sale of the property at the proposed site, period. Yes. And you regard that as proof, that one sentence, which begins with additionally, as establishing a policy of elevating eminent domain above all other considerations? Yes, we do in this case, because the environmental assessment showed that all other things about these sites were equal. And, in fact, even under the Commission's own, even under the facts that the Commission presents, the alternative site was a superior site. It would have impacted fewer landowners. It would have required. They say in the previous sentence, they give their principal explanation. With the exception of site C1, the proposed site would have the least number of residential structures within 0.5-mile radius and would have less steep slopes arraigned than C1. Yes. That's the reason they give, and then they say additionally, they've identified a landowner. Yes. But then one of the things that the Commission also had left out of that analysis was the most critical one, the reduction of air quality impacts by 40%. That was an argument that the petitioners had raised in the comments on the EA. There may be an error in their analysis, but that doesn't indicate that they're putting eminent domain above reductions in emissions, does it? Is there any place where they say that we're putting site ownership above reduction in emissions? The Commission said that it does have a policy of avoiding eminent domain, and that was one of the factors for its decision. But we also had come to that conclusion because there seemed to be no other rational explanation for why the Commission would reject a site that it itself admits would reduce emissions by 40% unless site control was something that it had focused on. In addition, the Commission also references the, and the Commission talks about this in its brief, it references the evaluation of the sites that were made by the applicant. And one of the things, the applicant had sort of said what factors were, what metrics were important. That was in the November 2015 submission by the applicant, which is in the joint appendix, I believe, at, let's see, I have a citation. I'll get you the citation in a minute. But in the applicant's analysis in this November 2015-2016 submission, it said that for this particular site, it gave it a 12, the highest possible factor in terms of the impact of site control. And the reason it did that, we believe, is because it had already acquired the other site. And so it had no, it didn't want to face the risk of having to acquire a second site because it had already purchased the first site before, it had already purchased the first site before it had applied for the project. And so the Commission, at least in this brief, references that filing and says that site control was something that was really important to the applicant. And the reason for that, again, was because it had purchased the site, which brings me back to the NEPA argument, which is that NEPA forbids a private applicant from taking certain action that would foreclose serious consideration of alternatives. And that's really our second argument, is that the fact that the applicant had already purchased the site foreclosed the Commission's consideration of the alternatives in a serious fashion. The Commission, even though the parties had repeatedly asked for consideration of a smaller-sized compressor as an alternative, that was something that was not done in the environmental assessment. The environmental assessment talks about the steep slope, the steep slope differences and the streams. The environmental assessment recognizes that there is, you know, less farmland would be impacted and also fewer landowners. And that's in the Joint Appendix at 344, that's the paragraph-long assessment in the EA. But the EA never discusses that you could have had a smaller compressor station at this site, nor does the Commission's certificate order discuss the 40 percent reduction. It's not until the rehearing request that issued a year and a half later where the Commission offhandedly says, oh, and yes, by the way, even if you did reduce the size of the emissions from the compressor by 40 percent, it wouldn't make a difference anyway because the project is complying with a permit.  There's a reason why NEPA requires consideration of alternatives within an environmental assessment. Because when you start looking at the alternatives, as one court has said, it can lead the analysis in a different direction. And so if the Commission had considered the possibility of downsizing the compressor station at the site, it might have not required you, it would have cut the footprint of the project in half by 50 percent. So it might have allowed for the applicant to avoid use of steep slopes. It would have diminished the amount of trees that would have had to be cleared from the site. So those are all things that if this had been evaluated in the environmental assessment, it should have been done, then we wouldn't have this problem. And this court has also looked at, in some of its precedent, like the Union Neighbors case, this court has said, looking at alternatives isn't enough. It's not an empty analysis. You have to look at alternatives where there are significant differences. You can't look at 12 different versions of the same site, same trailer, different park, same compressor station, different site. You have to also look at alternatives that have different features to them, that have differences between them. And one of the things here, a version of this same song that wasn't looked at, was having a smaller compressor station at a site that was more midway between the two points, which would have allowed for the reduction in size of the compressor station. And as to FERC's explanation that a 40 percent reduction doesn't matter because you have a permit in place, I just wanted to discuss that point a little bit more. The major permit sets a threshold for emissions. Without that permit, the emissions of this project would exceed that threshold. But between that threshold of maximum emissions under the permit and a 40 percent reduction, you still have a significant impact that could be mitigated. And the example I give there is, you know, let's say that there's a company that has a budget for $100,000 for equipment, and it spends $99,000. Nobody in the corporation would accuse the company of overspending. But if you could get that same equipment for $60,000, a reasonable person would realize that that's a significant difference. And that's the error that the commission makes. As it says, this 40 percent reduction isn't significant because it falls below that ceiling. And that's just not rational decision making. And again, we believe that just looking at this decision in its context shows that the only way the commission could have possibly arrived at that was through its myopic focus on site control, because nothing else explains why a commission or why the commission would ignore a 40 percent reduction in emissions from a 60,000 horsepower compressor station. Our expert, Dr. Robertson, testified this would be a reduction in 70 tons of NOx each year. And this project, you know, this compressor station. Is his information properly before us? Yes, Your Honor. Oh, I understand what you're asking. So there were two aspects of Dr. Robertson's analysis. What had happened was he initially, early on, in June of 2016, he submitted two comments on the environmental assessment relating to the size of the compressor. The first was some theoretical assumptions he had about being able to reduce the size. And the second had to do with being able to move the compressor to a different location and reduce the size there. So that's from June 2016. After the commission order came out, the certificate order came out and rejected his views, he tried to get the Critical Energy Information Act information, the confidential information, to update his analysis of the compressor station size at the existing site. And he wasn't able to get the information in a timely fashion. And so those, and essentially what that information did was really corroborate his earlier argument. So even if you were to ignore everything that came from that additional confidential information, his initial comments that he made on reducing the size of the compressor station and the 40% reduction were still in the record in his filings in June of 2016. And those were before the commission, and nobody disputes that. I just wanted to also quickly get to the point of the emissions issue. As we read the commission's decision, this court would have to vacate or seriously gut its decision in Sierra Club in order to affirm the commission's decision. And the reason that we argue that is because in Sierra Club this court said, we have noted greenhouse gas emissions are an indirect effect of authorizing this project. And then it went on to say that even though we've said these are indirect effects, there may be situations where the commission doesn't have to quantify. In its rehearing order here, JA 690 paragraph, rehearing order paragraph 58, the commission says, we affirm the certificate decision and find that this case, the case effects related to production or consumption of natural gas are not indirect effects of broad run expansion. There is no way to reconcile the commission's findings saying that there's no indirect effects with this court's holding in Sierra Club. And that's one of the problems with the commission's decision. Roberts. The commission says that the difference is that here it says it doesn't know where the gas will be consumed or what fuels it will displace. That's what it says. That's why this case is different. And then it says, quote, and I want to ask you about this, and likely neither does the entity over which the commission has jurisdiction. My question is, have you challenged that here? Have you challenged the commission's statement that not only does it not know where the gas will be consumed but the applicant here, Tessie, neither does it. In other words, there's no point in asking them because they don't likely know. Do you challenge that here? No, we haven't, and here's why. Because Sierra Club addresses that. Sierra Club talks about the gas going to the power plants, but it also acknowledges that those power plants might not be built. We don't know how those power plants are going to operate. So there's uncertainty inherent even in sending the gas to the power plants, which is something the Sierra Club acknowledged. And so because it acknowledged that there could be some uncertainty about that, there was no reason to challenge the specific issue of whether the applicant could get the information or not. And that goes to what the Mid-Coast Court has talked about, the difference between the extent of impacts and the nature of impacts. The nature of impacts here, the indirect impacts, are something that are – in Mid-Coast it said that if the extent of impacts are speculative but the nature isn't, a court still has to address those impacts in its environmental impact statement, following the guidance that is provided for information that is uncertain. And here it's the extent, and arguably maybe the extent of the impacts is potentially speculative. We would say that it isn't because Commissioner LaFleur found a way to quantify those impacts, and the commission quantified those impacts too in Sable Trail. But what the commission can't do is to deny that those impacts exist to do the circular reasoning that Commissioner Glick talked about, to say, well, these are so speculative and so uncertain that they don't exist at all. They're not indirect impacts. And that's something that really needs to be corrected. But the other point is that there's got to be some kind of a starting point. Maybe the information can't be gleaned from an applicant, but there's still a value to measuring what the emissions are, even at the full burn analysis that Commissioner LaFleur provided. We can't manage what we don't measure. And if we don't even begin to measure the climate change impacts from the upstream and downstream emissions of these projects, we're not going to be able to even address those impacts going forward. The record is less clear on the production, the upstream emissions, but, again, we feel that there is sufficient evidence in the record to tie this single producer of these impacts to the project. And also the commission, in its certificate order, found that the projected production from these wells would exceed pipeline capacity unless more capacity was built. Well, that gas isn't going to be produced unless those pipelines are in place. I have reserved the remainder of my time for rebuttal. I don't know if there are any more questions now. Apparently not. Thank you. Thank you. Thank you. May it please the court, Robert Solomon for the commission. I would like to address the issues in the order that they were presented by Petitioner's Council. She started with the consideration of alternatives and the agency's assessment of all the various metrics. She has focused on site control and the possibility of lower emissions from a possibly smaller compression station. And then I will turn to her argument that the agency has essentially gutted the import of the 2017 Sierra Club decision. First, as to alternatives, the agency did not ignore anything and the commission, in its environmental assessment, considered all of the arguments and all of the factors that were presented to the agency at the time the environmental assessment was prepared. In the environmental assessment at pages 345 to 346, there is a comprehensive matrix of all of the factors considered, all 18 assessed against the preferred compressor station, 563 offered by Tennessee Gas Pipeline, and the other 12 alternatives that were identified by the applicant. So I want to indicate at the outset that the commission is not passive here. The applicant only presented four alternatives to the compressor station in Jolton, Tennessee. The commission came back and said, based upon the comments, we want to know whether the applicant considered any alternatives that are outside of Davidson County, including the preferred C1 alternative, which is located in Cheatham County, and other alternatives in Robertson County. What the commission found, based upon the environmental assessment's assessment of all of the various factors concerning all of the various sites, is that none of the alternative sites had a significant environmental advantage over the site of the compressor station favored by the applicant. The commission was very fair here. It noted in its assessment, paragraphs 109 to 112 in the certificate order, that some factors favored the Tennessee favored site, and other factors favored the citizens favored site. The applicant site is better with respect to fewer steep slopes, and better with respect to no intermittent water body crossings. The C1 site favored by the citizens in Cheatham County is better with respect to farmland and seismicity areas, fewer residences, and no park. When it comes to eminent domain, as Judge Garland noted on paragraph 111 of the certificate order, JA 497, the commission said, and because Tennessee indicated that the landowner would be unlikely willing to sell at the site of the citizens favored site, that is simply an additional factor that demonstrates that no of the alternative sites have any particular environmental advantage over the Tennessee favored site. Petitioner's counsel also focuses on the possibility of a smaller compressor station, either at the Tennessee site or at the preferred C1 site in Cheatham County. The reason why the environmental assessment did not consider the possibility of a smaller compressor station is because that is an argument that was not presented to the commission until after the environmental assessment had been prepared. All of the testimony of Dr. Robertson comes in June or September of 2016 after the environmental assessment had been prepared. The additional testimony comes in August 2017 after the certificate order had issued. Can I ask you to skip ahead to the greenhouse gas issue? Yes. I want to ask the question that I asked Ms. Skutson, although I think I formulated it a little better this time. I think my real problem may not be so much with the opinion of the commission, but with your briefing, I don't mean you personally, and actually not in this case, but in the Otsego case. But since you're on that brief, maybe you could explain to me. It starts at page 34 of the brief for FERC in that case. In the Otsego case. In Otsego, yes. It's on this question of whether the commission's authority over certificates of convenience and necessity is sufficient to establish the legal causation element, leaving aside whether it's foreseeable, whether it's sufficiently direct or indirect. And it's raised by Ms. Elephant's suggestion that we would have to overturn Sierra Club to adopt everything that you want. So in the last paragraph on page 34, it says, in addition the Sierra Club's causation conclusion was driven by the court's view that the commission has the legal authority to mitigate downstream effects. Here, however, Section 1B of the Natural Gas Act expressly excludes local distribution companies and distribution facilities from the commission's jurisdiction. And then on the next page it says there are no conditions the commission can impose on the construction of jurisdictional facilities that will affect the end use. That's from your Florida case, FERC's Florida case. And then the next paragraph, finding that these jurisdictional limitations break the causal chain is consistent with the Supreme Court's directive. So that's what I'm interested in, is whether the jurisdictional limitations break a causal chain. The jurisdictional limitations are relevant, but they are not dispositive. We are not arguing that this case is like the public citizen case where the Federal Motor Carrier Safety Administration had no ability or authority to stop the introduction of Mexican motor carriers onto United States roads. We were indicating that the- So I'm clear. You acknowledge, A, that the commission, because of NEPA, can consider environmental concerns in deciding whether the public interest standard is satisfied for the certificate of convenience and necessity. It's one of many issues, but it is an issue that they could consider, yes? Yes, that is something the agency can consider. And two, you agree, in light of our Sierra Club opinion, that because the commission has the authority to not grant, it can affect downstream effects. That was- Even though the, in this case, the downstream may be a non-jurisdictional entity. Because the pipeline itself is, and the commission can deny the certificate, it can cut off downstream emissions. I think there is a difference in that respect between the Sierra Club decision and this case. The court in Sierra Club said that there was a reasonably close causal relationship because the commission could deny the certificate. That would forbid the construction and operation of a 500-mile-long pipeline that would directly connect to the gas-burning generating plants in Florida. If the commission had turned down the certificate, there would have been no gas whatsoever going to those generating plants. So we knew, and the court knew, that in fact- I don't want you to subtly slide from the jurisdictional problem to the approximate cause problem. You're not taking the position, then, that the jurisdictional limitations by themselves break the causal chain. That is correct, and for purposes of NEPA- It's correct that you're not taking that position. That is correct. We brought up the jurisdictional limitations to point out that there are limitations to the agency's ability to ask for information, to receive information, and to- But wait a second. Excuse me. Why does the commission's lack of jurisdiction over the downstream customers limit its ability to ask the applicant for information? It doesn't limit our ability to ask the jurisdictional pipeline for information, but it limits the ability of the jurisdictional pipeline to obtain information that it can then give to the agency. And why is that? Why? Why? Well, Your Honor, the commission believes that information about the volume of the pipeline, the build-out midstream, doesn't provide useful and meaningful information. That's not my question. That's not my question. I understand that's the commission's position, but I thought you were saying that the lack of jurisdiction over the downstream users, customers, somehow limited the commission's ability to ask the applicant before the commission for information about the downstream users. Well, those are meaningful conditions that we can attach to. No. I understand all that. I get that. You can't impose conditions on the downstream users. As you yourself said in answer to Chief Judge Garland, you could deny the certificate, and then there wouldn't be any downstream gas, right? Right. I was simply reacting to what you said, which is – and I found that curious. I thought I heard you say that because of the jurisdictional issues that Chief Judge Garland is raising, that limits FERC's ability to ask the applicant for information. Did I mishear you about that? No, you did not mishear me. Okay. Well, then explain that to me. Or maybe you want to withdraw the argument, because it sounds like you're not really willing to support that argument. I'm willing to support that argument only to the extent that there is additional difficulty. It doesn't preclude or foreclose anything. And I do want to add that with respect to the question, why don't we ask for additional information, this is something that the agency is now considering in a pending notice of inquiry. Truly, this has been an issue that has been challenging to my agency for the two-year temporary period. My agency was doing more than it thought it had to do by asking for conservative, worst-case, full-burn calculations. It's not doing that right now, but it has asked the questions about how much information it should receive. It has asked the information about what it should do with any information it does receive. It has asked the questions about whether there are any appropriate models that can translate any quantified, incremental amount of emissions into climate change effects. These are difficult issues as a matter of policy, but as a matter of law, the commission believes that these cases, both the Broad Run case and the Otsego case, are not at all like Sierra Club, where you had the direct connection, you had the build-out of pipe directly connecting to an end-use customer. And Sierra Club court rightly said that if the agency had denied the certificate, there was no possibility for additional gas flowing to that end-use customer, or the possibility of additional incremental emissions from the burning of that gas. In both of these cases, unlike the Sierra Club case, where you had the build-out of new pipe to reach new end-use customers, here all we have is the addition of compression, which expands the capacity of the integrated interstate transportation grid, but does not provide an additional connection up to production fields. It doesn't provide an additional connection, but it provides additional capacity, and you had Antero contract for that additional capacity. So here we know exactly that there is going to be additional capacity. We know who has signed up for it, and we know where they're going to get their gas from. So why isn't this like Sierra Club, except with respect to upstream effects rather than downstream effects? We don't know the answer to all of those questions. Before the natural gas can leave the wells and reach the interstate grid, the gas first has to go through low-pressure, low-diameter gathering pipelines, which are regulated at the state level. That gas then needs to be processed into natural gas quality gas, and then be injected into the interstate grid. My understanding is that Tennessee gas pipeline is interconnected with a number of other further jurisdictional pipelines. Antero, the shipper here, contracted for this additional compression, but it did so to obtain access to the southeast market. We don't know if the southeast market will be consuming additional gas, and I find it really quite likely that what the southeast market will do is replace natural gas that historically has come from the Gulf Coast with natural gas from the mid-Atlantic Appalachian states. For purposes of indirect effects, what the commission is looking for is not just simply a causal relationship. Admittedly, everything in the supply chain from the wellhead to the burner tip has a causal relationship. What the agency is looking for, as the Supreme Court required in public citizen, is a reasonably close causal relation that is akin to the approximate cost standard in tort law, not just simply a but-for standard. Judge Wilkins, you have identified something that is a little different between the two cases. While both cases concern only additional compression and additional capacity midstream, in the Otsego case, the shippers were two local distribution companies which were on the downstream side of the pipeline. They were closer to end users. In this case, the Burkhead case, the shipper is Antero Resources, which is both a producer and a marketer of natural gas, which is on the upstream side of the pipeline. And we believe the most relevant case is not the Sierra Club versus FERC decision from 2017, but rather the Sierra Club versus Department of Energy case from 2017, which issued just one week prior to the Sierra Club versus FERC. That was the Department of Energy case concerning the export of liquefied natural gas and whether there would be an inducement effect on upstream natural gas production. What the commission said is that production effects tend to be very localized. You need to have the location and timing and amount. The Department of Energy in that case also was able to rely upon high-level macro studies of how exports and unconventional drilling methods affect production. And before I sit down, I do want to point out that we have a similar reliance in both of these cases. On paragraph 70 of the certificate order, page 482, the commission said, nonetheless, even though we don't believe that the upstream effects are indeed need-by-indirect effects, the commission looked at Department of Energy and EPA studies. Indeed, the commission relied upon the same 2014 Department of Energy addendum to FERC-issued environmental impact statements that informed the Department of Energy and informed this court in that case. Now that you've put in high relief the distinction between Otsego in this case, in this case you have Antero as the, as you described it, both the shipper and the producer. Could you have asked Antero where is the gas going to come from? Is there going to be a new well? Is there going to be just additional volume from an old well, et cetera? No. What the commission said was, no, the commission could not direct the non-jurisdictional producer to provide that information. But the commission also said. That wasn't the question. Antero is the one that signed up for this. Correct. They're the ones who are necessary for the certificate of convenience and necessity, right? Yes. Okay. So to get beneath the question of how much volume they want to ship, you can ask, certainly ask that same entity the question, where is the volume going to come from? In other words, here you have actually a specifically identifiable entity you could have asked the question to, as compared to Otsego where you explain that there's distribution and we don't know where it will end up. Well, what the commission said is even with that identifiable producer shipper, even that shipper is unlikely to know where the molecules are going to come from. Well, I thought you said they were the producer as well. They are both a producer and a marketer of natural gas. They both. So what if their answer was, we're intending to drill 10 additional wells. We'd like to drill 10 additional wells. We can't do that without a pipeline. That's why we're asking for the pipeline. I'm not saying that is what happened. It probably isn't. But this is the kind of information that would make a difference, isn't it? Yeah. Given that hypothetical, that could be akin to the downstream situation that we have in Sierra Club. Just as Sierra Club, we knew that the electric generating plants could not operate without that additional pipeline. I guess it's hypothetically possible that you could have a producer that says, we can't ship the molecules from defined specific wells unless we have a particular buildout on a particular line somewhere in the integrated system. And in that circumstance, I think there would be an analogy that could be made to the Sierra Club decision. Okay. Further questions? No. Thank you, Your Honor. Do we have an intervener? Yes, we do. May it please the Court, my name is Brian O'Neill, and I represent the intervener, respondent intervener, the only intervener I guess, Tennessee Gas Pipeline Company. And I want to touch upon a number of things. I think Mr. Solomon covered the landscape very well. With respect to the claims that upholding this commission's decision here would gut the Sable Trail decision, we think that's preposterous. The situation here involves facts that are significantly different and readily distinguishable from the Sable Trail case. In Sable Trail, as has been mentioned, there were identifiable power plants in the pipeline. As the Court concluded, the purpose of the pipeline was to provide natural gas to those generation facilities in Florida. Here, that's not the case. There's no way of determining where the gas ultimately will go. But why isn't it the same as Sable Trail, but with respect to upstream effects? With respect to upstream effects, here we have a shipper who is a producer marketer, as has been explained. We do not have, there's nothing in the record to demonstrate, and as far as we know, there are no wells or no areas that are specifically dedicated to this project. The producer marketers have a variety of ways that they make their living. One way is to produce gas. Another way is to buy and sell gas. Another way is to buy and sell the capacity on the pipelines that they arrange to have transportation on. In addition, over time, the source of the gas changes from time to time. What would have happened if the Commission had said to your client, Tennessee, as part of your application, we need you to ask the shipper marketer where the gas is coming from? Well, that didn't happen, but if it had happened, I suspect that my client would have gone to Antero and posed the question. I don't know what Antero would have said. My belief is that producer marketers keep their business information as close to the chest as possible because they are in competition for their business. Those interests can be accommodated in the administrative process. That's not a problem. I suspect that's true, Your Honor. But you don't, I mean, I hear what you're saying. At this point, you just don't know where that gas is coming from. That's correct. We don't know. And the question I ask the Commission in both this and the other cases, well, why not ask? I suspect they could ask, Your Honor, but we don't know. We certainly don't know. In fact, we don't even know whether the gas that's delivered to us, by the way it comes to us via another interstate pipeline. But as an applicant, you wouldn't, I mean, I don't want to take you beyond what you are comfortable saying here, but as an applicant representing an applicant, you would take that question and go ask the shipper what the answer is, right? When the regulator asks us questions, we generally answer them as promptly as possible and as completely as possible. I see my time is up. Thank you. Other questions? No. Thank you very much. Time left? All right. We let FERC go over a little bit. We'll give you two more minutes. Thank you, Your Honors. I just want to respond to one of the points that Mr. Solomon had made. He said – Before you do, I'm sorry. I just thought I'd make sure someone asked. With respect to the issue about the new policy, which was raised in the previous, you don't have any challenge specifically to the new policy in your brief. Is that right? No, because we had come after the new market case, and since we're the second in line, we didn't raise the new policy issue. One of the arguments Mr. Solomon had made was about how this gas was likely to displace other emission sources. Again, that's something that's addressed by Sierra Club. The Sierra Club court said nor is FERC excused for making emissions estimates just because the emissions may be partially offset by reductions. So in my view, all of the arguments that FERC is making regarding downstream have been fully addressed by Sierra Club, and the court would have to overturn its decision. On the jurisdictional issues, there's a Supreme Court case back from 1961, FPC versus Transcontinental Gas Corporation, where the commission had decided to deny a certificate because the boilers were going to use natural gas, which FERC considered to be an inferior use and said they should be using coal. So the case is like kind of an old testament in many regards. And the Supreme Court found that FERC could do that. FERC had been challenged because those were considered non-jurisdictional uses, and the court said that FERC can look at any issues that are bearing on the public interest. And again, we wouldn't be asking FERC to assert jurisdiction over the downstream uses. The last fact that's most important about looking at these impacts is because it's just important to have all of the information out there. The commission may have re-evaluated or may have taken the 40 percent reduction in emissions on this local project more seriously if it could have seen the whole universe of emissions quantified. And more importantly, the public could see that and decision makers could see that. So that's why just quantifying the information is something that's very, very important. And the last thing is we had cited a bunch of cases. They were from lower courts. They deal with emissions from leasing activity, mining coal or oil and then burning it later. These were cited in our brief at page 37 to 38. And if courts there were able to find that impacts were foreseeable, where you've got coal and gas, you don't know where it's going, and it's going nationwide. In this case, we know how much gas is going, and we know that it's going to the southeast. And so if courts were able to determine that agencies should be required to look at those impacts, where they're sufficiently foreseeable and not speculative in the leasing cases, I don't see any reasoned distinction between those cases and a gas pipeline case where you have more information. Thank you, Your Honors. We'll take the case under submission. Thank you very much.
judges: Garland, Tatel, Wilkins